UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KEVIN JARED ROSENBERG,

                Plaintiff-Appellee,

       -against-

EDUCATIONAL CREDIT MANAGEMENT
CORP.,

                Defendant-Appellant.

**MEMORANDUM OPINION
AND ORDER**

20-CV-00688 (PMH)

PHILIP M. HALPERN, United States District Judge:

Educational Credit Management Corporation ("Defendant") appeals from the January 7, 2020 Memorandum Decision and Order Granting Summary Judgment in Favor of Plaintiff and Discharging Debtor's Student Loan Under 11 U.S.C. § 523(a)(8) ("January 7th Order") issued by Chief Judge Cecelia G. Morris of the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"). The January 7th Order: (1) granted summary judgment in favor of Kevin J. Rosenberg ("Plaintiff"); (2) denied Defendant's cross-motion for summary judgment; and (3) discharged the debt owed to Defendant—a single debt, consisting of various student loans consolidated into a single amount ("Student Loan")—under 11 U.S.C. § 523(a)(8). (*See* Doc. 1).

Defendant, on January 24, 2020, filed both a notice of appeal challenging the January 7th Order (*id*.) and a motion for leave to pursue an interlocutory appeal (Doc. 3). On March 4, 2020, Judge Seibel—before whom this appeal proceeded before it was reassigned to this Court on March 17, 2020—granted Defendant leave to appeal the January 7th Order. (Doc. 12).

Defendant filed both its opening brief (Doc. 20, "Def. Br.")[1] and the appendix of record on appeal (Doc. 21-1, "App'x")[2] on May 20, 2020. Plaintiff filed his opposition brief on June 23, 2020 (Doc. 22, "Opp. Br.")[3] and the matter was briefed fully with the submission of Defendant's reply brief on July 15, 2020 (Doc. 37, "Reply Br.").

In addition to the parties' filings, the Court received two *amicus curiae* briefs and an unauthorized *amicus curiae* letter from non-party entities arguing that the January 7th Order should be affirmed. The first submission, an unauthorized *amicus curiae* letter, was filed by the Legal Services NYC Bankruptcy Assistance Project ("NYCBAP") on June 30, 2020. (Doc. 29, "NYCBAP Ltr."). The second submission, an *amicus curiae* brief permitted by Federal Rule of Bankruptcy Procedure 8017(a)(2), was filed by the New York State Department of Financial Services ("NYSDFS") on July 3, 2020. (Doc. 31; Doc. 53, "NYSDFS Br.").[4] The final submission,

---

[1] Defendant filed its initial brief twice—once at Doc. 20 and again at Doc. 21. There appears to be no difference between the filings.

[2] The appendix spans more than four hundred pages and twenty separate docket entries (Doc. 21-1 through Doc. 21-24). Accordingly, for ease of reference when citing the appendix, the Court cites not to the specific docket entry, but to the pagination at the bottom center of each page.

[3] Plaintiff's opposition brief, filed on June 23, 2020, lacks a table of contents and table of authorities, and contains notations scattered throughout—where citations to the record would naturally be entered— indicating, for example, "E.A. ___," "CITE," and "No citation to the record." (Opp. Br. at 2-3, 7-8, 12). That same day, after filing its opposition brief, Plaintiff filed a letter requesting, *inter alia*, "leave to file a corrected brief to correct deficiencies . . . including a lack of table of contents, table of authorities, and other errors." (Doc. 23). The Court granted Plaintiff's request on June 24, 2020. (Doc. 25). That Order read, in pertinent part, as follows: "Application to file a corrected appellee's brief granted . . . limited to including tables of contents and authorities, inserting complete citations to the record, and rectifying any formatting problems in the original brief, and not including any substantive revisions or additions . . . ." (*Id*.). Plaintiff filed a revised brief on June 27, 2020. (Doc. 26). On July 10, 2020, the Court determined that the revised brief violated the June 25, 2020 Order and struck the revised filing. (Doc. 35). As such, the Court considers the brief Plaintiff filed initially on June 23, 2020.

[4] Although the Court concluded that NYSDFS was not required to move for permission to file an *amicus curiae* brief (Doc. 30), the agency filed its brief as a "motion" sequence on the docket. That motion sequence was terminated by an Order entered on December 3, 2020 which directed NYSDFS to refile its *amicus curiae* brief under a different filing event (Doc. 52). NYSDFS refiled its brief that same day; the Court, accordingly, cites to the brief filed in December 2020.

an *amicus curiae* brief permitted by Order of the Court, was filed by Veterans Education Services ("VES") on July 17, 2020. (Doc. 42, "VES Br.").[5]

For the reasons set forth below, the January 7th Order is REVERSED insofar as it granted Plaintiff's motion for summary judgment, AFFIRMED insofar as it denied Defendant's cross-motion for summary judgment, and REMANDED for further proceedings not inconsistent with this Memorandum Opinion and Order.

## BACKGROUND

Before reaching the substantive analysis at issue in this appeal, the Court recounts first the facts necessary to conduct the extant analysis. Rule 7056-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of New York provides, in relevant part:

> Upon any motion for summary judgment pursuant to Bankruptcy Rule 7056, there shall be annexed to the motion a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit the statement shall constitute grounds for denial of the motion.

Local Bankr. R. 7056-1(b). The party opposing such a motion, in a similar fashion, "shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs . . . ." Local Bankr. R. 7056-1(c). Notably, "the statement of material facts required to be served . . . shall be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local Bankr. R. 7056-1(d).

The facts outlined herein are, accordingly, taken from the record and, in substantial part, from Defendant's Response to Plaintiff's Statement of Material Facts Not in Dispute and Counter-

---

[5] Although VES' *amicus* brief was submitted after Defendant filed its reply brief, Defendant addressed VES' submission in its reply brief. (*See* Reply Br. at 20-22).

Statement of Material Facts as to Which There Exists No Genuine Issue Pursuant to Fed. R. Civ.

P. 56(c) and LBR 7056-1 ("Defendant's Counterstatement"). (*See* App'x at 317-25).[6]

I.   <u>Procedural History</u>

Plaintiff filed a voluntary petition for bankruptcy under Chapter 7 of the United States

Bankruptcy Code on March 12, 2018 ("Chapter 7 Proceeding"). *See In Re Rosenberg*, No.18-BK-

35379 (Bankr. S.D.N.Y.), Doc. 1.[7] Approximately three months after initiating the Chapter 7

Proceeding, on June 18, 2018, Plaintiff filed a parallel adversary proceeding seeking to discharge

his student loan debt ("Adversary Proceeding"). *See Rosenberg v. NY State Higher Educ. Servs.

Corp.*, No. 18-AP-09023 (Bankr. S.D.N.Y.), Doc. 1.[8] The Amended Complaint in the Adversary

Proceeding presses a single claim which, in its entirety, reads:

> Based on the allegations above, this Court should determine that
> Plaintiff's student loan debt should be discharged under either the
> Brunner Test or, in the alternative, the 'Totality of the
> Circumstances' test.

(Adv. Proc., Doc. 5 at 5; *see also* App'x at 43).

On November 14, 2018, the Bankruptcy Court entered a Consent Order Authorizing

Educational Credit Management Corporation to Intervene in Adversary Proceeding Pursuant to

---

[6] Plaintiff did not submit a statement in accordance with Local Bankruptcy Rule 7056-1 and cited only one document in his moving papers. However, in drafting Defendant's Counterstatement, Defendant construed Plaintiff's moving papers "as a *de facto* statement of material facts and respond[ed] to them accordingly." (App'x at 318). The Bankruptcy Court cited Defendant's Counterstatement only once in its seven-sentence recitation of the underlying, pertinent facts. (App'x at 7).

[7] The Court is entitled to take judicial notice of the filings in the Bankruptcy Proceeding. *See Armouth Int'l, Inc. v. Fallas*, No. 19-CV-03669, 2021 WL 795448, at *1 (S.D.N.Y. Mar. 1, 2021) ("The Court also considers matters of which judicial notice may be taken, namely documents filed in the ongoing bankruptcy proceeding involving Armouth and National." (internal quotation marks omitted)). Citations to documents filed in the Bankruptcy Proceeding but not included in the appendix shall cite to the docket in the following format: "Bankr. Proc., Doc. __."

[8] Citations to documents filed on the docket in the Adversary Proceeding but not included in the appendix cite directly to the corresponding docket entry with the following format: "Adv. Proc., Doc. __."

Fed. R. Civ. P. 24(a) and (b) and for Related Relief. (App'x at 57-59). That Order allowed Defendant, with Plaintiff's consent, to intervene in the Adversary Proceeding and reflected the parties' agreement that Defendant "in its role as specialized guarantor, has taken assignment, and is the holder, of one (1) federal consolidation loan owed by Plaintiff, with an outstanding principal balance of approximately $214,093 as of August 9, 2018 . . . and thus is the proper party in interest in this adversary proceeding with respect to the ECMC Loan . . . ." (*Id*. at 57).

Plaintiff secured a general discharge of his debt in the Chapter 7 Proceeding by Order dated July 26, 2018. (*See* Bankr. Proc., Doc. 13). About one year later, on August 27, 2019, Plaintiff filed a motion for summary judgment in the Adversary Proceeding seeking "an Order granting discharge of his student loan debt, and granting such other relief as the Court may deem fair and just." (App'x at 64). On October 8, 2019, Defendant opposed Plaintiff's motion and cross-moved for summary judgment. (*See id*. at 80-343).[9] Plaintiff filed a "response" to Defendant's cross-motion on October 22, 2019. (*See id*. at 344-48). Shortly thereafter, on October 29, 2019, Chief Judge Morris held a conference and directed that additional information concerning the Student Loan be provided. (*See* Adv. Proc., Doc. 66 (transcript of October 29, 2019 appearance)). Defendant provided the additional information to the Bankruptcy Court by way of a declaration (with exhibits) submitted on November 19, 2019. (*See* App'x at 349-404).

Less than two months later, on January 7, 2020, the Bankruptcy Court granted Plaintiff's motion, denied Defendant's cross-motion, and—concluding that the debt held by Defendant

---

[9] It is unclear, based upon the notice of cross-motion, what relief Defendant sought aside from "an order granting ECMC summary judgment in the . . . adversary proceeding . . . ." (App'x at 80). ECMC did not seek summary judgment on any affirmative defense. Nor did it suggest the Court should search the record and find against Plaintiff. Defendant's memorandum of law in the Adversary Proceeding, however, argued in pertinent part: "[T]he Court should deny Plaintiff's Motion. In addition, because there are no issues of material fact regarding Plaintiff's failure to establish his right to an undue hardship discharge, the Court should grant ECMC's Cross-Motion and award it summary judgment." (*Id*. at 328).

imposed an undue hardship on Plaintiff—discharged the Student Loan under 11 U.S.C. § 523(a)(8). (*Id.* at 5-16).[10] Approximately two weeks later, on January 24, 2020, the Bankruptcy Court issued an Order Granting Summary Judgment in Favor of Plaintiff and Discharging Debtor's Student Loan Under 11 U.S.C. § 523(a)(8). (Adv. Proc., Doc. 72).

II.   Plaintiff's Higher Education, Military Service, and Legal Career

Plaintiff is a veteran who financed his higher education, before and after serving in the military, with student loans. Plaintiff received his undergraduate degree in history from the University of Arizona in 1996. (App'x at 88-89, 322; *see also id.* at 7, 41). His studies at that institution were financed, in part, by student loans. (*Id.* at 88). After graduating from college, Plaintiff served in the United States Navy for about five years. (*Id.* at 88, 322; *see also id.* at 7; Opp. Br. at 4). Following his active-duty service, Plaintiff began his legal studies at Yeshiva University's Benjamin N. Cardozo School of Law ("Cardozo") in August 2001. (App'x at 88, 322; *see also id.* at 7; Opp. Br. at 4). His graduate studies, like his undergraduate studies, were financed in part with student loans. (App'x at 109, 322; *see also id.* at 7; Opp. Br. at 4). Plaintiff graduated from Cardozo with his law degree in December 2004 and sat for the bar in mid-2005.[11] (*Id.* at 89, 322). Plaintiff passed the bar and was admitted to practice in both New York and New Jersey, but his law licenses are currently in "retired status." (*Id.* at 90, 323).

Following his graduation from Cardozo, Plaintiff worked for about two-and-a-half months as an associate at a law firm in Englewood Cliffs, New Jersey. (*Id.* at 89, 323). Plaintiff made an

---

[10] The January 7th Order was published in the Bankruptcy Reporter. *See In re Rosenberg*, 610 B.R. 454 (Bankr. S.D.N.Y. 2020). The Court cites to that copy of the January 7th Order provided in the appendix.

[11] Plaintiff's time at Cardozo was interrupted for about six months in 2003 when he returned to active duty. (*See* App'x at 88-89).

annual salary between $55,000 and $60,000 in that position. (*Id*. at 89, 323). When asked about

that employment, Plaintiff testified:

> I quickly realized that I wasn't - - well, it confirmed what I found in law school, that I didn't - - I wasn't cut out to be [a] lawyer. I couldn't handle working in an office. I wasn't very good at the job. I really hated the job, and it was making me miserable right away.
>
> . . . .
>
> I like to be creative, and I felt like my job, was, as you know, was to find what's been done before for the longest period of time . . . being stuck by myself in an office in front of a computer all day long. I didn't find the cases very interesting. I didn't find the work very interesting. You know, I would dread going in in the morning. I would, as soon as I arrived, I looked at the clock to figure when I leave for lunch. I tried to make the lunch last as long as possible. I tried to stay in the office long enough not to get fired.

(*Id*. at 90). Plaintiff was ultimately terminated from that position after a partner at the firm learned

that Plaintiff was unhappy and intended to leave. (*Id*.).

Plaintiff, following his termination, performed contract legal work on a sporadic basis until,

at the latest, 2008. (*Id*. at 92 (testifying that contract work "went away" after the economic

downturn in 2008), 93, 323; *see also id*. at 219). Plaintiff testified that he has sought legal contract

work since then, but has been unable to locate any opportunities at least "within a couple hours"

of his residence and found "nothing that paid well." (*Id*. at 92). Aside from the bouts of contract

legal work and his time at the firm, Plaintiff has not had any other legal employment and has not

researched what steps would be necessary to reactivate his law licenses. (*Id*. at 90, 92, 323).

III.   <u>Plaintiff's Entrepreneurial Endeavors and Current Living Arrangements</u>

Plaintiff chose, after his stint in private practice and contract legal work, to pursue a career

in the outdoor recreation industry and started his own company—Gear To Go Outfitters, LLC

("Gear To Go")—in January 2009 from an apartment in Brooklyn, New York. (*Id*. at 93-95, 324).

That company offered both equipment (for sale and to rent) and guide services. (*Id*. at 94, 324). Plaintiff ran Gear To Go for just under a decade, and the venture proved mildly successful for a time; indeed, Plaintiff represented that Gear To Go resulted "in a salary of $100,000 at its peak." (*Id*. at 346; *see also id*. at 304, 324).[12] Given the success of Gear To Go, Plaintiff moved out of his apartment in Brooklyn and leased a house in Beacon, New York, in September 2016. Plaintiff made this decision because he was "tired of living in New York" and had intended "to move out of the city for a couple of years" before doing so. (*Id*. at 106).[13] The lease for the house in Beacon was $2,150 per month—a $700 increase from the $1,450 monthly rent Plaintiff paid for his studio apartment in Brooklyn. (*Id*. at 325; *see also id*. at 106-07).

After initiating the Chapter 7 and Adversary Proceedings in March and June 2018, respectively, Plaintiff: (1) started a new company, International Adventure Guides ("IAG"), in October or November 2018; and (2) sold Gear To Go for $3,500 on December 31, 2018. (*Id*. at 102-04). IAG offers services similar to Gear To Go, but focuses instead solely on offering guided tours. (*Id*. at 103-104). Plaintiff testified that he has been unable to secure any other employment.[14] (*Id*. at 117-18). Plaintiff testified, however, that he does not consider employment further than 60 miles—or approximately one hour one way—from his residence in Beacon to be within a

---

[12] Notwithstanding Plaintiff's representations that his Gear To Go income reached $100,000, there are other instances in the record where he suggests that his annual income never reached that level. (*See, e.g.*, App'x at 306 (representing that Plaintiff's salary between 2013 and 2018 ranged from $19,955 to $81,250)).

[13] The house in Beacon has at least two bedrooms. (App'x at 325; *see also id*. at 106 (Plaintiff testifying that the house has "two to three [bedrooms], depending on how you want to look at it")).

[14] There are, however, references elsewhere in the record suggesting that since his deposition Plaintiff has taken on part-time work as a security guard. (*See, e.g.*, App'x at 220, 222).

"reasonable" commuting distance. (*Id*. at 93, 323-24).[15] As of his deposition in March 2019, Plaintiff did not intend to move from Beacon (despite being unable to pay the rent for that month). (*Id*. at 107).

The record reflects that Plaintiff is single, has no dependents, has never been married, and, at the time of his deposition in March 2019, was 45 years old. (*Id*. at 110, 301, 307-09, 322). There is also evidence in the record that Plaintiff suffered injuries and underwent surgery that may or may not have impacted his ability to work. (*See id*. at 102-03, 309; *see also id*. at 223 ("The VA approved the surgical procedure in 2017. He stated that as a result of that surgery, he had to cancel all of his hiking trips for the summer of 2017 which impacted his business.")).

IV.   The Vocational Report

The only document Plaintiff provided in support of his motion for summary judgment—albeit not in admissible form—was part of a Vocational Evaluation Report ("Vocational Report") completed by Kenneth E. Ogren ("Ogren") of The Return to Work Center. (*See* App'x at 66-79; *see also id*. at 84, 216-91).[16] The Vocational Report indicates that, given his experience, Plaintiff could be employable in a number of settings, such as: (1) a legal assistant or paralegal (*i.e.*, positions that would not require reactivation of his law licenses), with an annual salary between $42,000 and $120,000; (2) a retail store manager, with an annual salary between $45,000 and

_____

[15] Plaintiff recognized that the Metro-North Railroad—a commuter rail extending north from Grand Central Terminal in Manhattan—has a stop in Beacon. (App'x at 93). When asked about taking the train to work, Plaintiff rejected the idea, reasoning, "It just takes longer then, because the trip to New York City . . .would be over two hours. You have 90 minutes on the train itself, plus you have to get to the station, find parking. The nonpermit parking spaces are usually further afield, so you are walking, waiting, then have to get to the subway, it is going to be two and a half to three hours each way." (*Id*.; *see also id*. at 346 (arguing that commuting on the Metro-North amounts to "an undue hardship")).

[16] Defendant presented a complete version of this document to the Bankruptcy Court in admissible form (*i.e.*, as an attachment to counsel's declaration in support of the cross-motion). (*See* App'x at 84, 216-91). The Court, consequently, cites to the version filed by Defendant.

$100,000; and (3) other customer service and sales roles, with an annual salary between $36,000 and $50,000. (*Id*. at 223-27, 324).[17]

V.   The Student Loan

Plaintiff sought, in March 2005, to consolidate all of his federal student loans through the Federal Family Education Loan Program. (App'x at 351, 355-58 (application and promissory note signed by Plaintiff on March 17, 2005); *see also id*. at 20). The application was granted and loans were consolidated in April 2005, resulting in creation of the Student Loan in the principal amount of $116,465.00. (*Id*. at 322, 351, 360-366; *see also id*. at 20). Citibank was the original lender of the Student Loan, and the original guarantor was the New York State Higher Education Services Corporation ("NYSHESC"). (*Id*. at 351, 367-68, 404). From April 2005 until April 2015, and from April 2016 to October 2016, the Student Loan underwent various periods of deferment or forbearance. (*See id*. at 384-402; *see also id*. at 28).

Shortly thereafter, in or around December 2017, Plaintiff defaulted on his repayment obligations with respect to the Student Loan. (*Id*. at 352, 367 (noting on December 29, 2017, "DEFAULTED, UNRESOLVED"); *see also id*. at 26 ("As of the filing of this bankruptcy case, Petitioner's Student Loan is currently in default." (internal quotation marks omitted))). Between the disbursement of the Student Loan in 2005 and his default in 2017, Plaintiff paid a total of $2,983.90 of that debt. (*Id*. at 352, 384-402). After Plaintiff defaulted on the Student Loan, the NYSHESC—as guarantor—paid a default claim to Citibank. (*Id*. at 352). Then, after Plaintiff filed his voluntary petition for bankruptcy, NYSHESC assigned its interest in the debt to Defendant.

---

[17] Plaintiff argued, without citation to any evidence, that the Vocational Report concluded both that "there is no practical way to return to the legal profession" and identified positions that "pay far less than would be required to maintain a minimal standard of living and still" repay the debt. (App'x at 63). Notably, the Vocational Report observed that "[i]f [Plaintiff] wished to return to work as an attorney, he would need to update the CLE credits are required by the states . . . and pay the necessary fees." (*Id*. at 221).

(*Id*. at 322, 352, 381-82). As of November 18, 2019, the outstanding balance on the Student Loan totaled $221,385.49. (*Id*. at 352, 404; *see also id*. at 7).

The petition initiating the Chapter 7 Proceeding identified the following unsecured claims: (1) $11,934.30 in tax debt owed to the United States Internal Revenue Service; (2) $400.00 in tax debt owed to the New York State Department of Taxation and Finance; (3) $183,758.63 in student loan debt owed to Mullooly, Jeffrey, Rooney & Flynn LLP ("Mullooly"); (4) $169,286.34 in student loan debt owed to NYSHEC; (5) $17,308.25 in student debt owed to Yeshiva University; (6) $189.85 in an outstanding utility charges owed to National Grid; (7) $66.20 in tolls and fees owed to the New York State Thruway; and (8) $217.00 in tolls and fees owed to Metropolitan Transportation Authority. (*Id*. at 187-90). In total, these debts amounted to $383,160.57. Of that total, $370,353.22 (*i.e.*, the debts owed to Mullooly, NYSHEC, and Yeshiva University)—or, phrased another way, 96.66% of the total debt Plaintiff identified—represented student loans. Plaintiff testified that the main reason for initiating the Chapter 7 Proceeding was "[a]bsolutely" to discharge his student loan debt. (*Id*. at 105; *see also id*. at 324).

## STANDARD OF REVIEW

Where—as here—the Court exercises its appellate jurisdiction over proceedings in the United States Bankruptcy Court, *see* 28 U.S.C. § 158(a), it:

> may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.

28 U.S.C. § 2106; *see also In re Bernard L. Madoff Inv. Secs., LLC*, No. 15-CV-01151, 2016 WL 183492, at *8 n.14 (S.D.N.Y. Jan. 14, 2016) (explaining that, although Federal Rule of Bankruptcy Procedure 8013 was amended and language explaining that the Court "may affirm, modify, or

reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings" was removed, the authority remains because "logic compels" that result "with respect to the appellate powers of the District Court" (internal quotation marks omitted)), *aff'd sub nom. Matter of Bernard L. Madoff Inv. Secs., LLC*, 697 F. App'x 708 (2d Cir. 2017).

Generally, when sitting in this appellate capacity, a district court reviews a bankruptcy court's findings of fact for clear error and reviews conclusions of law *de novo*. *See In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 103 (2d Cir. 2000) ("Like the District Court, we review the Bankruptcy Court's findings of fact for clear error, [and] its conclusions of law *de novo* . . . ." (internal citations omitted)); *In re Enron Corp.*, 307 B.R. 372, 378 (S.D.N.Y. 2004) ("A bankruptcy court's conclusions of law are reviewed *de novo* and its findings of fact for clear error."). Here, however, the Court encounters an appeal concerning cross-motions for summary judgment in an adversary proceeding. Consequently, in this particular scenario, where "a district court reviews a bankruptcy court's grant of summary judgment, it reviews the decision '*de novo* because the determination that there are no genuine issues of material fact is a legal conclusion.'" *In re Carpenter*, 566 B.R. 340, 347 (S.D.N.Y. 2017) (quoting *In re Teligent Inc.*, 324 B.R. 479, 487 (S.D.N.Y. 2005)); *see also In re Lehman Bros. Inc.*, No. 17-CV-06246, 2018 WL 10454936, at *2 (S.D.N.Y. Sept. 26, 2018) ("A district court reviews an appeal of a Bankruptcy Court's grant of summary judgment *de novo*, drawing all factual inferences in favor of the non-moving party." (internal quotation marks omitted)), *aff'd sub nom. In re Lehman Bros. Holdings Inc.*, 792 F. App'x 16 (2d Cir. 2019); *Townsend v. Ganci*, 566 B.R. 129, 133 (E.D.N.Y. 2017) ("A bankruptcy court's decision to grant summary judgment based upon undisputed facts is reviewed *de novo*."), *aff'd sub nom. In re Townsend*, 726 F. App'x 91 (2d Cir. 2018).

"In bankruptcy adversary proceedings such as this one, the standard for summary judgment is the same as in any federal civil action." *Osuji v. Azie*, No. 20-CV-01365, 2021 WL 602699, at \*3 (E.D.N.Y. Feb. 16, 2021); *see also* Fed. R. Bankr. P. 7056 ("Rule 56 F.R.Civ.P. applies in adversary proceedings . . . .").

Under Federal Rule of Civil Procedure 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Liverpool v. Davis*, 442 F. Supp. 3d 714, 722 (S.D.N.Y. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-05486, 2013 WL 1681261, at \*1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248). The Court's duty, when determining whether summary judgment is appropriate, "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id*. (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not to determine the truth or weigh the evidence; the task is material issue spotting, not material issue determining. *See Bryant v. Iheanacho*, No. 20-2256, 2021 WL 4314477, at \*1 (2d Cir. Sept. 23, 2021) ("It is a bedrock rule of civil procedure that a district court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented." (quoting *Frost v. New York City Police Dep't*, 980 F.3d 231, 245 (2d Cir. 2020)). Therefore, "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial . . . ." *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007)

(quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)). Claims simply cannot proceed in the absence of sufficient proof as to an essential element.

"It is the movant's burden to show that no genuine factual dispute exists," *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)), and a court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Id*. (citing *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003)). Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." *Liverpool*, 442 F. Supp. 3d at 722 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The non-movant cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the true nature of the facts . . . ." *Id*. (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, "[i]f there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sood*, 2013 WL 1681261, at *2 (citing *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)).

Should there be no genuine issue of material fact, the movant must establish also its "entitlement to judgment as a matter of law." *In re Davis New York Venture Fund Fee Litig.*, 805 F. App'x 79, 80 (2d Cir. 2020) (quoting *FIH, LLC v. Found. Capital Partners LLC*, 920 F.3d 134, 140 (2d Cir. 2019)). Stated simply, the movant must establish that the law favors the judgment sought. *Gonzalez v. Rutherford Corp.*, 881 F. Supp. 829, 834 (E.D.N.Y. 1995) (explaining "that summary judgment is appropriate only when . . . law supports the moving party"); *Linares v. City of White Plains*, 773 F. Supp. 559, 560 (S.D.N.Y. 1991) (explaining that summary judgment is

appropriate when "the law so favors the moving party that entry of judgment in favor of the movant dismissing the complaint is proper").

The Court is, of course, mindful that "[*p*]*ro se* litigants are afforded a special solicitude," which includes reading their filings "to raise the strongest arguments they suggest." *Mortimer v. City of New York*, No. 15-CV-07186, 2018 WL 1605982, at *9 (S.D.N.Y. Mar. 29, 2018) (internal quotation marks omitted). "It is through this lens of leniency towards *pro se* litigants that this Court must consider a defendant's motion for summary judgment against a *pro se* plaintiff." *Adams v. George*, No. 18-CV-02630, 2020 WL 5504472, at *5 (S.D.N.Y. Sept. 8, 2020). This status does not, however, excuse a *pro se* litigant from making the showing required to defeat summary judgment; he or she must offer more than "bald assertions, completely unsupported by evidence" to overcome the motion. *Wisdom v. Loiodice*, No. 17-CV-04837, 2020 WL 4431590, at *4 (S.D.N.Y. July 31, 2020); *see also Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (explaining that the mere fact that a litigant is *pro se* "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment" (internal quotation marks omitted)); *Ross v. Koenigsmann*, No. 14-CV-01321, 2017 WL 9511096, at *1 (N.D.N.Y. Aug. 16, 2017), *adopted sub nom. by Ross v. Mannava*, 2017 WL 4338883 (N.D.N.Y. Sept. 29, 2017).[18]

---

[18] Plaintiff proceeded *pro se* before the Bankruptcy Court but is represented by counsel in this appeal. Notwithstanding the leniency afforded a lay *pro se* litigant, Plaintiff—who holds "retired" licenses to practice law in New York and New Jersey—offered absolutely no evidentiary basis upon which to grant his motion. Even applying the most liberal standard applicable to *pro se* litigants, his moving papers consisted of just over two pages of argument and a part of the Vocational Report. (App'x at 62-79). This submission was facially insufficient, as a matter of law, to establish that there were no genuine issues of material fact *and* that Plaintiff was entitled to judgment as a matter of law. This failure to make an evidentiary showing, on its face, is sufficient to warrant denial of Plaintiff's motion for summary judgment and reversal of the January 7th Order.

## ANALYSIS

"Student loans are presumptively nondischrageable in bankruptcy." *In re Tingling*, 990

F.3d 304, 308 (2d Cir. 2021) (quoting *Easterling v. Collecto, Inc.*, 692 F.3d 229, 231 (2d Cir.

2012)). Indeed, the Bankruptcy Code provides explicitly that a discharge under Chapters 7, 11, 12,

or 13 does not discharge, *inter alia*, an individual's debt:

> **(8)** unless excepting such debt from discharge under this paragraph
> would impose an undue hardship on the debtor and the debtor's
> dependents, for--
>
> **(A)(i)** an educational benefit overpayment or loan made, insured, or
> guaranteed by a governmental unit, or made under any program
> funded in whole or in part by a governmental unit or nonprofit
> institution; or
>
> **(ii)** an obligation to repay funds received as an educational benefit,
> scholarship, or stipend; or
>
> **(B)** any other educational loan that is a qualified education loan, as
> defined in section 221(d)(1) of the Internal Revenue Code of 1986,
> incurred by a debtor who is an individual.

11 U.S.C. § 523(a)(8). This statute "renders student loan debt presumptively nondischargable

unless a determination of undue hardship is made." *United Student Aid Funds, Inc. v. Espinosa*,

559 U.S. 260, 277 n.13 (2010) (internal quotation marks omitted).

The Second Circuit has, for over thirty years, applied a three-part test to assess whether a

debtor has established—by a preponderance of the evidence—the existence of an undue hardship

and thereby overcome the presumption that the student loan debt is nondischargable. As explained

by the Second Circuit originally in 1987, the:

> standard for undue hardship requir[es] a three-part showing: (1) that
> the debtor cannot maintain, based on current income and expenses,
> a minimal standard of living for herself and her dependents if forced
> to repay the loans; (2) that additional circumstances exist indicating
> that this state of affairs is likely to persist for a significant portion of

> the repayment period of the student loans; and (3) that the debtor has
> made good faith efforts to repay the loans.

*Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987) (internal

quotation marks omitted); *see also In re Tingling*, 990 F.3d at 309 (same); *In re Traversa*, 444 F.

App'x 472, 474 (2d Cir. 2011) (same); *Opetubo v. Citibank Student Loan Corp.*, 74 F. App'x 145,

145 (2d Cir. 2003) (same). The Second Circuit reaffirmed recently the propriety of the *Brunner*

test in adjudicating "undue hardship" applications, observing, "[t]his so-called *Brunner* test

reflects the Section 523(a)(8) statutory scheme exhibiting 'clear congressional intent . . . to make

the discharge of student loans more difficult than that of other nonexcepted debt . . . .'" *In re*

*Tingling*, 990 F.3d at 309 (quoting *Brunner*, 831 F.2d at 396 (first alteration added)).

   Based upon the Court's *de novo* review, neither Plaintiff nor Defendant has established

their entitlement to summary judgment under the *Brunner* test in the Adversary Proceeding.[19]

---

[19] The Court, at this juncture, notes that the *amici* filings are of little assistance in the proper adjudication of this appeal, as they constitute little more than policy arguments for why the January 7th Order must be affirmed. (*See* NYCBAP Ltr. at 1 (explaining that "[w]e submit this *amicus* letter to provide the Court with information about the importance of this issue, and the terrible toll that non-dischargeable student loan debt is inflicting on our clients"); NYSDFS Br. at 3 ("[T]here have been significant changes in both the legal regime and the practical experience of student loan debt that should inform any application of the undue hardship test. The bankruptcy court here appropriately took account of these changes in applying the *Brunner* test . . . ."); VES Br. at 13 ("The Bankruptcy Court got it right in recalibrating the *Brunner* test and its decision should be affirmed."), 14 ("The Bankruptcy Court's decision, correcting years of misapplication of the *Brunner* standard, strikes the right balance by preserving the undue burden test as intended by Congress while allowing struggling borrowers to overcome the crippling burden of overwhelming debt. Affirming the Bankruptcy Court's interpretation of the *Brunner* standard will aid veterans . . . .").) Policy arguments, whatever their objective, do not sway this Court's adherence to statutory mandates and precedent. *See, e.g.*, *Sandoz Inc. v. Amgen Inc.*, 137 S. Ct. 1664, 1678 (2017) ("The plausibility of the contentions on both sides illustrates why such disputes are appropriately addressed to Congress, not the courts. Even if we were persuaded that Amgen had the better of the policy arguments, those arguments could not overcome the statute's plain language, which is our primary guide to Congress' preferred policy." (internal quotation marks omitted)); *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 137 S. Ct. 954, 967 (2017) ("First Quality and its supporting *amici* also make various policy arguments, but we cannot overrule Congress's judgment based on our own policy views."); *Empire HealthChoice Assurance, Inc. v. McVeigh ex rel. Est. of McVeigh*, 402 F.3d 107, 110 (2d Cir. 2005) ("By emphasizing such factors as the potential practical effects of our original holding . . . Empire and its *amici* present, at most, cogent arguments for why, as a policy matter, federal jurisdiction should be extended to cover Empire's claims. Such policy arguments, however, are for Congress rather than the courts . . . .").

I.   *Brunner* Prong No. 1: Income, Expenses, and the Minimal Standard of Living

At the first step of the analysis, Plaintiff must establish that he "cannot maintain, based on current income and expenses, a minimal standard of living for [himself] and [his] dependents if forced to repay" the Student Loan. *Brunner*, 831 F.2d at 396 (internal quotation marks omitted). This prong "requires a debtor to show that if the debtor, based on current finances, is required to make the monthly student loan payment, the debtor's standard of living will fall below a minimum level." *In re Hlady*, 616 B.R. 257, 270 (Bankr. E.D.N.Y. 2020) (quoting *In re Thoms*, 257 B.R. 144, 148 (Bankr. S.D.N.Y. 2001)). This assessment does not mandate that Plaintiff "live a life of abject poverty, but it does require more than a showing of tight finances." *In re Jean-Baptiste*, 584 B.R. 574, 587 (Bankr. E.D.N.Y. 2018) (internal quotation marks omitted). Indeed, Plaintiff "must demonstrate financial circumstances that go[] beyond the garden-variety financial hardship that most debtors experience." *Id*. (internal quotation marks omitted). "'[T]he proper inquiry is whether it is unconscionable to require debtor to earn more income or reduce expenses' in order to repay the" debt. *In re Shenk*, 603 B.R. 671, 678 (Bankr. N.D.N.Y. 2019) (quoting *In re Wells*, 380 B.R. 652, 659 (Bankr. N.D.N.Y. 2007)); *see also In re Thoms*, 257 B.R. at 148 ("The debtor must show more than that the repayment of the loan will require him or her to forbear significantly in personal and financial matters or that the debtor will endure a restricted budget."). Stated succinctly:

> [w]hen applying this prong of the *Brunner* test, courts focus on a debtor's household income and expenses to determine what expenses are necessary for the debtor to meet [his] basic needs, such as food, shelter, clothing, transportation and medical treatment for [himself] and any dependents before repaying the student loan debt. Additionally, courts consider whether a debtor has sought to maximize [his] ability to earn adequate income to pay for expenses and student loans while minimizing certain discretionary expenses.

*In re Hlady*, 616 B.R. at 271 (internal citations and quotation marks omitted). Notably, "[w]here a debtor is eligible to enroll in an income-based repayment program, the debtor must demonstrate

how [he] will be unable to make the limited payments required under the formula and still maintain a minimal standard of living." *Id*. at 272.

Plaintiff failed to carry his burden on this element. Plaintiff's expenses, as reflected in his initial petition (and relied upon by the Bankruptcy Court), are summarized as follows:

| MONTHLY EXPENSES | | |
|:---:|:---|:---:|
| 1 | Rent | $2,150.00 |
| 2 | Real Property Insurance | $25.00 |
| 3 | Home Maintenance Costs | $150.00 |
| 4. | Electricity/Heat/Natural Gas | $175.00 |
| 5. | Telephone/Internet/Cable | $150.00 |
| 6. | Food | $800.00 |
| 7. | Clothing/Laundry | $50.00 |
| 8. | Personal Care | $50.00 |
| 9. | Medical/Dental Expenses | $150.00 |
| 10. | Transportation Costs | $200.00 |
| 11. | Entertainment Costs | $25.00 |
| 12. | Vehicle Insurance | $80.00 |
| | **Total Monthly Expenses** | **$4,005.00** |

(App'x at 197-98). Plaintiff's claimed monthly income totaled: $2,456.24. (*Id*. at 195-96).

The arithmetic resulting from the filing is simple: if Plaintiff's claimed monthly expenses total $4,005.00 and his claimed monthly income totals $2,456.24, then he operates at a deficit of $1,548.76 every month. (*Id*. at 199; *see also id*. at 12 (concluding, based on the "means test" of 11 U.S.C. § 702(b)(2) that Plaintiff has "a current monthly income of -$1,548.74")). The Bankruptcy Court concluded that nobody—and the parties have pointed to no evidence to suggest that either

of them—objected to the accuracy of these numbers. (*Id*. at 12-13). The issue, however, is not whether these numbers are *accurate*. The question is whether these representations are sufficient to conclude that Plaintiff made the showing required on the first *Brunner* prong.

Upon review of Plaintiff's opposition brief here, as well as his moving and reply papers before the Bankruptcy Court, he offers no substantive explanation as to why his expenses are necessary to maintain a minimal standard of living and points to no admissible evidence supporting his conclusory argument that they are, indeed, necessary. (*See* App'x at 62-64, 344-48; Opp. Br. at 7-11). Plaintiff also failed to show how he would be unable to pay the Student Loan under a repayment plan available to him and maintain a minimal standard of living. (*See* App'x at 62-64, 344-48; Opp. Br. at 7-11).[20] Notwithstanding Plaintiff's failure to carry his burden on his motion, Defendant likewise failed to make a substantive showing regarding the necessity of Plaintiff's expenses or his ability to maintain a minimal standard of living. Indeed, Defendant's papers before the Bankruptcy Court rely generally on Plaintiff's decision not to pursue legal work, his refusal to seek another repayment plan, and his decision to live in Beacon. (*See* App'x at 335-37). This type

---

[20] The Bankruptcy Court reasoned that because the Student Loan is in default, it "is currently due and payable in the full amount of $221,385.49, plus interests and costs," and, therefore, Plaintiff established "that he cannot immediately pay his Student Loan in full on his current income." (App'x at 13). First, the Bankruptcy Court did not cite any admissible evidence supporting the conclusion that the debt was accelerated and that the entire balance was due and owing. (*Id*.). Second, even if that were the case and the Student Loan was so accelerated, Defendant argued—in conclusory fashion below, but more fulsomely here—that Plaintiff could rehabilitate the Student Loan in accordance with applicable regulations. (*See id*. at 336, 339-40; Def. Br. at 22). The Bankruptcy Court dismissed this argument as "hypothetical;" the Court disagrees. Plaintiff defaulted on his responsibility to pay the Student Loan and, although it appears opportunities exist to rehabilitate the debt, Plaintiff testified that he has no desire to do so. (*See* App'x at 110 (Plaintiff testifying that he would have no interest in a repayment plan)); *see also, e.g.*, 34 C.F.R. § 682.405(b)(1)(iii) (requiring that a loan rehabilitation agreement payment "be an amount equal to 15 percent of the amount by which the borrower's Adjusted Gross Income . . . exceeds 150 percent of the poverty guideline amount . . . except that if this amount is less than $5, the borrower's monthly rehabilitation payment is $5"). Were the Court to accept the general paradigm advanced by the Bankruptcy Court—*i.e.*, that when a debtor defaults on a student loan provided by the government, the fact that the outstanding balance is more than the debtor could pay in a single payment satisfies the first step of the *Brunner* analysis—it would, in practice, subvert the presumption against discharge embodied in 11 U.S.C. § 523(a)(8). Notably, the Bankruptcy Court did not appear to cite any precedent for this principle.

of cursory analysis does not engage in the sort of individualized fact-intensive assessment envisioned by either the summary judgment standard or the first prong of the *Brunner* test. Defendant, however, appears to concede this issue at least tacitly: in its brief before this Court, it argued that the Bankruptcy Court's "findings [were] incomplete as to whether the record, as it existed on summary judgment, was sufficient for a determination as a matter of law on the first *Brunner* prong." (Def. Br. at 22).

Based upon the foregoing, the Court concludes that both parties failed to make the showing required at summary judgment by establishing both that there were no genuine issues of material fact and that they are entitled to judgment as a matter of law with respect to the first *Brunner* prong.

II.    *Brunner* Prong No. 2: Existence of Additional Circumstances Likely to Persist

The second step of the analysis requires that Plaintiff establish "that additional circumstances exist indicating that this state of affairs [(*i.e.*, being unable to repay the Student Loan and maintain a minimal standard of living)] is likely to persist for a significant portion of the repayment period . . . ." *Brunner*, 831 F.2d at 396. Unlike the first prong of the test—which focuses on the present—this step looks to the future and "takes into account the nature of education as a long term investment that may not pay dividends for years to come." *In re Stern*, 288 B.R. 36, 42 (Bankr. N.D.N.Y. 2002) (quoting *In re Vinci*, 232 B.R. 644, 652 (Bankr. E.D. Pa. 1999)). As reiterated by the Second Circuit, this showing requires "evidence 'not only of current inability to pay but also of additional, *exceptional* circumstances, strongly suggestive of continuing inability to repay over an extended period of time.'" *In re Traversa*, 444 F. App'x at 474 (quoting *Brunner*, 831 F.2d at 396 (emphasis added)). Establishing "'[m]ere inconvenience, austere budget, financial difficulty and inadequate present employment,' are insufficient" to make the showing at this stage.

21

*In re Shenk*, 603 B.R. at 680 (quoting *In re Wetzel*, 213 B.R. 220, 225 (Bankr. N.D.N.Y. 1996) (alteration in original)). At this step:

> courts may consider a debtor's medical condition, disability, or responsibility for his or her dependents. Courts have also considered a debtor's assets, career, income or potential for increased career and financial opportunities, and whether a debtor has maximized [his] income potential, has more lucrative job skills, has limited working years left, and whether there are factors that would prevent the debtor from retraining or relocating.

*In re Hlady*, 616 B.R. at 275-76 (internal citations and quotation marks omitted); *see also In re Shenk*, 603 B.R. at 680 (explaining that, at the second step, "courts must consider 'assets, career, income or potential for increased career or financial opportunities . . . .'" (quoting *In re Davis*, 373 B.R. 241, 249 (W.D.N.Y. 2007) (alteration in original)); *In re Gesinde*, No. 18-AP-01434, 2019 WL 5090080, at *5 (Bankr. S.D.N.Y. Oct. 10, 2019) ("Courts look to see if there is evidence indicating a total foreclosure of job prospects . . . . Relevant considerations of additional circumstances may include the existence of disability or illness, advanced age, or responsibility for dependents. Instances of mild hardship, disability, or illness may not be enough . . . ." (internal citations and quotation marks omitted)). The inability to pay must persist "because of factors beyond the debtor's control." *In re Hlady*, 616 B.R. at 275 (internal quotation marks omitted).

With respect to Plaintiff's motion, he insisted—based upon generalized and conclusory statements, untethered to any admissible evidence aside from the Vocational Report—that he made the showing required for the second element of the *Brunner* test. (*See* App'x at 62-63). Plaintiff's arguments on this point can be summarized as follows: (1) he suffered injuries that may limit his ability to work; and (2) his future employment prospects must be dim by virtue of the fact that the bulk of his experience has been in retail and "[t]he brick & mortar retail industry has collapsed and there is no indication it will ever rebound . . . ." (*Id*. at 62-63). Neither of these arguments make the showing required to secure summary judgment.

While physical injuries may, indeed, speak to this element, *see In re Traversa*, 444 F. App'x at 474-75, Plaintiff neither cited nor presented any admissible evidence—either in his papers before the Bankruptcy Court or in the opposition brief here—establishing the severity of his injuries or their impact. (*See generally id*. at 62-64, 344-48; Opp. Br.).[21] Plaintiff's purported injuries cannot, therefore, support his showing on the second prong. As for his employment prospects, the test requires consideration of, *inter alia*, whether Plaintiff maximized his earning potential and has more lucrative job skills. *See In re Hlady*, 616 B.R. at 275. Plaintiff does not engage in that analysis and, instead, takes aim at the Vocational Report he himself put before the Bankruptcy Court by arguing that it is not evidence, that its conclusions about his prospects are based on conjecture, and that the positions it identified would not allow him to repay the debt. (*See* App'x at 63, 344; Opp. Br. at 12-13). This is similarly insufficient to affirmatively secure summary judgment. Plaintiff, to establish his entitlement to discharge, was required to put forth admissible evidence establishing that there are no genuine issues of material fact that there are "exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time," *In re Traversa*, 444 F. App'x at 474 (internal quotation marks omitted), and that he is entitled to judgment as a matter of law. He has simply failed to do so.[22]

---

[21] Plaintiff represented to the Bankruptcy Court that he produced medical records to Defendant. (App'x at 346). Those documents do not appear to have been submitted to the Bankruptcy Court.

[22] As noted previously, part of the analysis at this stage asks the Court to consider, *inter alia*, whether Plaintiff "has maximized [his] income potential" or "has more lucrative job skills." *In re Hlady*, 616 B.R. at 275. The Court will not belabor the point, but on remand, Plaintiff will have to square these considerations with the fact that he has decided to forego any legal employment. Plaintiff is free to make that decision, but that will not excuse him from repaying the Student Loan. *See, e.g.*, *In re Stern*, 288 B.R. at 42-43 ("[T]he Debtor has apparently taken the position that she is absolved from paying her legal education loans if she is not gainfully employed as a lawyer. This is not the standard. Borrowers under the various guaranteed student loan programs are obligated to repay their loans even if they are unable to obtain employment in their chosen field of study." (quoting *In re Vinci*, 232 B.R. at 652-53)). Indeed, "[a]n education bestows knowledge and opportunity, and not necessarily a specific employment. The government is not an insurer of employment merely because it provides low-cost financing to students." *In re Wetzel*, 213 B.R. at 226.

Defendant, in a similar fashion, failed to make the showing required on this point. Defendant's analysis argues generally that Plaintiff's circumstances—whatever they are, and whatever the impact on Plaintiff's ability to repay the Student Loan—are a monster of his own making. (App'x at 337-38; Opp. Br. 24-30). Plaintiff's circumstances and his inability to pay may well be a product of his own decisions; Defendant's presentation, however, prevents the Court from reaching that conclusion on a motion for summary judgment. Defendant has not addressed a variety of factual issues including, for example, what impact the injuries and surgeries (which exist in the record and are mentioned by Plaintiff, despite the decision not to include them in Defendant's Counterstatement) have had on Plaintiff's future earning potential. While the evidence certainly appears to rally against discharge, the analysis concerns the presence or absence of "exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time." *In re Traversa*, 444 F. App'x at 474 (internal quotation marks omitted). The Court simply cannot conclude, based upon the presentation, that Defendant has established that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law on this prong.

In light of the foregoing, the Court concludes that neither Plaintiff nor Defendant made the showing required to prevail on a summary judgment motion with respect to the second prong of the *Brunner* test.[23]

III.   *Brunner* Prong No. 3: Good Faith Efforts to Repay the Student Loan

The third and final step of the analysis requires that Plaintiff show that he "has made good faith effort to repay the loans." *Brunner*, 831 F.2d at 396. "This prong of the analysis recognizes

---

[23] The argument in Plaintiff's opposition brief relies heavily on the assumption that, because Plaintiff defaulted and the Student Loan has been accelerated, he has met his burden on the second *Brunner* element. (*See* Opp. Br. at 11-12). As noted above, the Court rejects both the factual and legal basis of this argument. (*See* discussion *supra*).

that undue hardship encompasses a notion that the debtor may not willfully or negligently cause his own default, but rather his condition must result from factors beyond his reasonable control." *In re Lozada*, 604 B.R. 427, 437 (S.D.N.Y. 2019) (quoting *In re Pobiner*, 309 B.R. 405, 420 (Bankr. E.D.N.Y. 2004)). This part of the test "requires that Debtor's 'condition [*i.e.*, his default] must result from factors beyond [his] reasonable control.'" *In re Shenk*, 603 B.R. at 681 (quoting *In re L.K.*, 351 B.R. 45, 54 (Bankr. E.D.N.Y. 2006) (second alteration in original)). "In making this determination, courts examine not only a debtor's loan payment history, but also a debtor's efforts to 'maximize his income, minimize his expenses, and participate in alternative repayment options.'" *In re French*, No. 04-AP-03060, 2006 WL 2583646, at *6 (Bankr. S.D.N.Y. Aug. 31, 2006) (quoting *In re Lebovits*, 223 B.R. 265, 274 (Bankr. E.D.N.Y. 1998)); *see also In re Pincus*, 280 B.R. 303, 316 (Bankr. S.D.N.Y. 2002) (noting that considerations on the third factor include efforts to maximize income and minimize expenditures, the payments made, as well as "deferment of payment"). Here again, Plaintiff cannot "avail himself of Code § 523(a)(8) if he is responsible for causing the undue hardship." *Pincus*, 280 B.R. at 316.

As with the two preceding elements, the Court cannot conclude, on the admissible evidence before it, that either party has met its burden on this prong. The record indicates that Plaintiff oscillated between deferment and forbearance for about a decade after graduating from law school—during which time he presumably made enough money to move out of New York City and rent a two-bedroom house—and ultimately made less than $3,000 in payments on a debt that ballooned from an initial balance of $116,465.00 to over $220,000.00. (*See* App'x at 28, 384-402 (forbearance/deferment); *id*. at 106-07, 325 (moving); *id*. at 20, 322, 351, 360-66 (initial balance); *id*. at 352, 384-400 (total debt repaid); *id*. at 7, 352, 404 (outstanding balance)). These considerations are compounded by Plaintiff's apparent decision to abandon his career in law (*i.e.*,

the field for which he assumed the debt in the first place), his admission that he filed the Chapter 7 Proceeding with the purpose of discharging the presumptively nondischargable Student Loan, and his representation that he has no interest in rehabilitating the debt through a repayment program. (*Id*. at 90, 92, 105, 110, 323). This constellation of evidence certainly suggests a lack of good faith and that Plaintiff has, indeed, placed himself in this predicament. The Court cannot, therefore, grant Plaintiff summary judgment on this prong.

Defendant's cross-motion is, however, likewise unavailing. Notwithstanding the hurdles to establishing good faith repayment highlighted by the record and recounted above—which may well be fertile ground for cross-examination at trial—the gaps in the evidence prevent the Court from granting Defendant's motion. These gaps include, for example, any argument concerning the reasons for Plaintiff's various deferments and forbearances, where Plaintiff's income (amounts which are, at best, unclear based upon the evidence) went if not to pay the Student Loan, and the import of Plaintiff's alleged injuries. These clear factual issues prevent the Court from concluding that Defendant is, as a matter of law, entitled to summary judgment on this prong.

Based upon the foregoing *de novo* review, the Court concludes that the Bankruptcy Court erred in rendering the January 7th Order. The Bankruptcy Court should not have granted summary judgment for either party because neither established the absence of genuine issues of material fact or their entitlement to judgment as a matter of law on any of the *Brunner* test's elements.

The Court expresses no opinion as to whether the Student Loan is dischargeable. The conclusions reached herein do not answer the question of whether the facts pass or fail the *Brunner* test; they concern, rather, whether the evidence passes the summary judgment test. Neither side satisfied its obligation under that analysis.

Either party may prevail at a trial on the facts; but that is an issue for the Bankruptcy Court.

## CONCLUSION

For the foregoing reasons, the January 7th Order is REVERSED insofar as it granted Plaintiff's motion for summary judgment and AFFIRMED insofar as it denied Defendant's cross-motion for summary judgment. This matter is REMANDED to the Bankruptcy Court for further proceedings not inconsistent with this Memorandum Opinion and Order.

The Clerk of the Court is respectfully directed to terminate this case.

**SO ORDERED:**

Dated:    White Plains, New York
          September 29, 2021

_____
PHILIP M. HALPERN
United States District Judge

27